**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

EDWARD RENO,

    Plaintiff,

v.                                               Case No. 2:20-cv-00918-GJF-KRS

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF EDDY; and DARLA BANNISTER,

    Defendants.

**FIRST AMENDED COMPLAINT FOR THE RECOVERY OF DAMAGES
PURSUANT TO THE NEW MEXICO TORT CLAIMS ACT AND
CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS**

Plaintiff brings this complaint for damages caused by the violation of the civil and constitutional rights of Plaintiff Edward Reno. Plaintiff files this complaint under the Federal Civil Rights Acts, and the Constitution of the United States. Plaintiff also brings claims under the New Mexico Tort Claims Act. In support of this Complaint, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. §§ 1331, 1367 and 42 U.S.C. §§ 1983, 1988.

2. Venue is proper as the acts complained of occurred exclusively within Eddy County, New Mexico.

**PARTIES**

3. At all relevant times, Plaintiff Edward Reno was a resident of Carlsbad, New Mexico, in the County of Eddy, and currently resides in the State of New Mexico

4. At all relevant times, Plaintiff Reno was a pretrial detainee in the custody and care of the Eddy County Detention Center (hereinafter "ECDC") from March 22, 2018 to July 5, 2018.

5. While detained, Mr. Reno was completely dependent upon ECDC for his care and well-being.

6. Defendant Board of County Commissioners for the County of Eddy (the "Board,") is a governmental entity within the State of New Mexico. The Board owns and operates ECDC as a county jail and detention center.

7. At all material times, Billy Massingill worked as Warden at ECDC and, as Warden, Massingill was responsible for the written and unwritten policies and procedures at ECDC. Warden Massingill was also responsible for ensuring that detainees at ECDC received medical care that complied with the New Mexico and United States Constitution.

8. At all material times, Defendant Darla Bannister ("Bannister") was an independent contractor employed by the Board as a health care provider for inmates and pretrial detainees.

9. Defendants Board and Bannister were acting under the color of state law and within the course and scope of their employment by the Board at all material times.

## FACTUAL BACKGROUND

10. On March 22, 2018, in Eddy County, New Mexico, 47-year old Edward Reno was arrested and was booked into ECDC and was screened medically by Nurse Pele (or Pell). At that time, he was noted to have "leg injury, diabetes, pneumonia."

11. Additionally, at the time of his incarceration, Mr. Reno also presented to ECDC with an obvious and previous partial right foot amputation, the result of his diabetes.

12. Mr. Reno told ECDC of this injury, and that his injury and diabetic condition required him to have shoes and clean socks on a regular basis.

13. Mr. Reno also told ECDC that he had an orthotic device that was to go in his shoe to protect his foot stump and permit him to ambulate with reduced pain and risk of injury and infection.

14. Instead, ECDC personnel put Mr. Reno in a separate cell, either for reasons of mental health or for medical reasons, and withheld regular changes of socks, and shoes. They also stripped him of his clothes, so that his previous amputation was entirely visible to ECDC personnel. To go anywhere in his cell, Mr. Reno was required to walk with his bare feet on the bare floor of his cell, on his partially amputated stump on his right foot.

15. Upon information and belief, the floor of the cell in which Mr. Reno was placed was not cleaned or disinfected prior to his placement, nor was it cleaned or disinfected at any time while he occupied his cell.

16. As a result of being housed in this cell and having to walk as a diabetic on his bare feet, Mr. Reno's feet began to crack and ulcerate. His foot would soon become infected and the infection would eventually spread to the bones in his right foot-stump.

17. On or about March 30, 2018, and at multiple times thereafter, Mr. Reno informed nurse S.D. Kurimski on duty that he was diabetic and that his foot was red, cracked and bleeding. He complained in an ECDC Medical Request Form that "I am diabetic. I have no meds, and my feet are cracked infected and in a lot of pain. I am an amputy [sic] of my right half of foot and concerned about losing my other at this point." Thereafter, he complained on multiple occasions the it was painful for him to stand or even walk due to the condition of his feet, but particularly his right foot.

18. Eddy County Detention Center Policy and Procedure 400.40 requires ECDC staff and medical staff to identify detainees that require an orthotic or prosthetic device at the time of

the detainee's intake at the jail and to order one for a detainee if they arrive to ECDC without an orthotic device.

19. Defendant Darla Bannister met with Mr. Reno on April 4, 2018. She noted in the medical record that Mr. Reno had ulcerations on his feet. Defendant Bannister ordered Metaformin, Keflex, and Gabapentin for Mr. Reno.

20. Mr. Reno told Bannister that he had previously had an orthotic device that went in his shoe. He explained that the device permitted him to ambulate with reduced risk of pain and injury and infection.

21. Bannister denied Mr. Reno the use of his own orthotic device.

22. Despite the clear language of ECDC Policy and Procedure 400.40, Defendant Bannister did not order a consult for orthotic or prosthetic devices. Defendant Bannister did not order that Mr. Reno should be able to wear shoes and socks to protect and support his foot-stump.

23. Upon information and belief, this decision was made as a cost cutting or cost saving measure.

24. Despite acknowledging Mr. Reno's partially amputated foot, neither ECDC staff nor medical staff ordered an orthotic or prosthetic device for Mr. Reno or even ordered a consult to have an orthotic device fitted.

25. Upon information and belief, neither ECDC staff nor medical staff conducted an interview or assessment regarding Mr. Reno's need for orthotic or prosthetic devices for his partially amputated foot.

26. No referrals were made to orthopedic/prosthetic medical offices. No consults were requested with orthopedic medical doctors.

27. Despite acknowledgment of Mr. Reno's partially amputated foot and Mr. Reno's instruction upon intake that his injury and diabetic condition required him to have shoes and clean socks on a regular basis, neither EDCD staff nor medical staff took steps to protect Mr. Reno's foot-stump from injury or infection.

28. As Mr. Reno's condition worsened, in April, 2018, ECDC personnel took Mr. Reno to Artesia General which examined him, treated him, prescribed medications for him, and made treatment recommendations.

29. ECDC personnel returned Mr. Reno to ECDC and, upon information and belief, put him back in the same cell, again took away his clothes, and again deprived him of regular changes of clean socks and shoes.  Mr. Reno was again forced to walk on his stump on the bare concrete any time he had to get up.  The cell which he had occupied before, and to which he returned, had not been cleaned or disinfected in the interim, upon information and belief.

30. On multiple occasions, ECDC personnel would put Mr. Reno into general population, and then return him to this cell, where the process of removing Mr. Reno's shoes and socks would continue.

31. At some point, Mr. Reno began to develop a fever, and cold sweats – a predictable consequence for having exposed dry, cracking, and bleeding ulcerations on his feet.

32. Ultimately, the condition of Mr. Reno's right foot deteriorated and ECDC transported Mr. Reno back to Artesia General Hospital due to intense pain and infection on or about May 23, 2018.

33. At that time, the medical personnel at Artesia General Hospital examined Mr. Reno and recommended a below the knee amputation of the remaining portion of his right foot, and part of his lower leg, to address what was described as "recurrent osteomyelitis of the right foot."

34. On or about June 8, 2018, medical personnel at Artesia General Hospital performed a below the knee amputation of Mr. Reno's right foot and leg. After the amputation Mr. Reno was returned to ECDC.

35. At all relevant times. ECDC had no policies or procedures in place to appropriately screen for, appropriately monitor or appropriately treat inmates and pretrial detainees suffering from diabetes who might experience diabetic complications and be injured or die as a result.

36. At ECDC Mr. Reno continued to complain about not feeling well and his amputation not healing correctly. Mr. Reno was ignored to the point where his lack of medical attention caused him to suffer from various infections including MRSA.

37. After he returned to ECDC, Mr. Reno was sent to an orthotics appointment and was measured for an orthotic device. However, a short while after Mr. Reno returned to ECDC, Warden Massingill came to Mr. Reno's cell and told him that he would not approve Mr. Reno's orthopedic device. Warden Massingill told Mr. Reno that he would not approve the purchase of the device because it was too expensive. Warden Massingill also expressed anger that Mr. Reno had surgery for the below the knee amputation as it was very expensive and the County had to pay for it. For that reason, Warden Massingill would not approve the orthotic device.

38. Since his release from ECDC, Mr. Reno has been unable to return to his work on oil rigs because he is not permitted to work on the rigs with an orthotic device. Mr. Reno cannot find employment in trucking or other fields that he previously worked in.

**COUNT I: VIOLATION OF U.S. CONSTITUTION 14th AND 8th AMENDMENTS
42 U.S.C. § 1983 INADEQUATE MEDICAL CARE
(All Defendants)**

39. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

40. The Eighth Amendment to the United States Constitution, which applies to Defendant Bannister pursuant to the Due Process Claus of the Fourteenth Amendment, forbids one who acts under the color of law from being deliberately indifferent to the serious medical needs of individuals in their custody and control.

41. Defendant Bannister violated the Eighth Amendment to the United States Constitution, as applicable to her via the Fourteenth Amendment, by each being deliberately indifferent to the serious medical needs of Mr. Reno, as set forth above.

42. At all relevant times, Defendant Bannister was acting under color of law.

43. As alleged herein, Defendant Bannister is an independent contractor who is contracted with Eddy County to provide medical care for detainees at ECDC.

44. At all relevant times, Mr. Reno was in the custody and control of EDCD.

45. As alleged herein, Defendant Bannister saw Mr. Reno on April 4, 2018 and noted cracked and bleeding ulcerations on his right foot. She prescribed Metaformin, Keflex, and Gabapentin.

46. As alleged herein, Defendant Bannister knew or should have known that a red, cracked, bleeding foot is an obvious sign of a serious medical condition for persons such as Plaintiff who suffer from diabetes.

47. ECDC was unequipped to monitor, care for, or treat Mr. Reno's medical conditions at the jail.

48. Defendant Bannister knew or should have known that the complaints Mr. Reno routinely made, coupled with his symptoms of infection, the open sores on his feet, and his known medical conditions, required timely intervention by a medical specialist, as well as enhanced medical protocols upon his return to ECDC.

49. Defendant Bannister failed to appropriately triage Mr. Reno, she failed to obtain for him timely medical care by a specialist, she actively ignored Mr. Reno's symptoms and complaints, and they dramatically exacerbated his previous injury by depriving him of a referral to an orthotic doctor for fitting an orthotic device, or ordering that Mr. Reno was entitled to clean socks and shoes instead of forcing him to walk barefoot on a bare, un-sanitized, cold concrete floor.

50. Mr. Reno was completely reliant on the ECDC and Defendant Bannister for his medical needs while at the jail.

51. The severity of Mr. Reno's condition was, or should have been, obvious to everyone who saw him, including Defendant Bannister.

52. The seriousness of Mr. Reno's medical condition was so obvious that, when placed into general population, inmates in his pod advocated for his medical care.

53. Defendant Bannister knew the risks Mr. Reno faced when he faced an extended length of time without proper care for the complications from his diabetes coupled with known ulcerations on his feet.

54. While Mr. Reno lay in his cell in cold sweats with a swollen foot bleeding and cracked at ECDC, Defendant Bannister exhibited no compassion or concern for Mr. Reno.

55. At all relevant times, Defendant Bannister was deliberately indifferent to Mr. Reno's serious and obvious medical needs, on an ongoing basis.

56. Defendant Bannister knew or should have known that a diabetic with a partially amputated foot required, at a minimum, regular changes of clean socks and shoes, and that forcing such a person to walk on un-sanitized, bare, cold concrete floor would be detrimental to the health of that person.

57. Defendant Bannister refused to assess Mr. Reno for an orthotic or prosthetic device as required by ECDC Policy and Procedure 400.40. Further, Defendant Bannister refused to order Mr. Reno to be able to wear socks and shoes to support his prior partial-foot amputation and to prevent the foot-stub from cracking, bleeding, and becoming infected.

58. As alleged herein, Defendant Bannister's refusal to assess or refer Mr. Reno for an orthotic or prosthetic consult was due to cut costs and to save money for Eddy County.

59. Defendant Bannister's conduct in this regard was objectively unreasonable and undertaken with willful, reckless and malicious indifference to Mr. Reno's constitutional rights and liberty interests and with no regard to the likelihood that harm would and did result and that Mr. Reno would and did suffer extreme unnecessary pain that bore no legitimate penalogical purpose.

60. As a direct and proximate result of Defendant Bannister's deliberate indifference, Mr. Reno endures to this day, excruciating pain, physical disfigurement, scarring, and lifelong physical impairment.

61. The acts and omissions of Defendant Bannister was of such a nature as to entitle Mr. Reno to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

62. Warden Massingill was deliberately indifferent to the Mr. Reno's constitutional rights when he knew about Mr. Reno's serious medical condition and the fact that he had been sized up for an orthotic device but refused to permit one to be ordered due to costs. Warden Massingill's decision was vindictive and done with callous disregard for Mr. Reno's rights and was the result of Warden Massingill's anger that Eddy County or the ECDC had to pay for Mr. Reno's surgery.

63. Defendant Board is responsible for the acts of Warden Massengill, who was employed to manage and oversee the ECDC and to ensure that the ECDC provided constitutional health care to detainees.

64. As a proximate and foreseeable result of Defendants' deliberate indifference to Mr. Reno's serious, obvious medical condition, Plaintiff suffered injuries including physical injuries, pain and suffering, emotional distress, exacerbation of his medical condition.

### COUNT II: 42 U.S.C. § 1983 – UNCONSTITUTIONAL POLICIES, CUSTOMS, AND PRACTICES
### (All Defendants)

65. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

66. The Eight Amendment to the United States Constitution, which applies to the Defendants pursuant to the Due Process Clause of the Fourteenth Amendment, forbids one from adopting, promulgating or approving a policy, procedure or custom that is deliberately indifferent to the serious medical needs of individuals in their care, custody and control.

67. At all relevant times, Mr. Reno was in the custody, care and control of ECDC such that Mr. Reno had to rely exclusively on the defendants for his medical care and treatment.

68. At all relevant times, Defendants were acting under the color of law.

69. It was the policies and/or practices of Defendants and their agents, officials, employees, and all persons acting collectively under the color of state law, in their official capacities, and are the proximate cause of Mr. Reno's deprivation of rights secured by the United States Constitution under the Eighth Amendment.

70. The Board of County Commissioners for the County of Eddy, the statutory defendant in this action and standing in place of Warden Billy Massingill, has adopted, promulgated and approved policies and practices which have exposed Mr. Reno to serious harm

and injury from inadequate medical care.

71. Likewise, as described herein, Defendant Bannister has adopted, promulgated and approved practices and customs which have exposed Mr. Reno to serious harm and injury from inadequate medical care.

72. The Defendants were deliberately indifferent to the medical needs of individuals in their care, custody, and control, including without limitation developing or promoting policies, procedures and customs concerning refusal to order consultations for orthotics or prosthetics; refusing to order Mr. Reno be permitted to wear shoes and socks while in or around his cell; placing Mr. Reno in dirty cells that had not been cleaned or disinfected; and the management of long term chronic diseases, such as diabetes.

73. As alleged herein, the practice and custom of not referring patients out for orthotic or prosthetic consults is designed to save Eddy County money and leaves detainees like Mr. Reno in pain and at risk for worsening medication conditions, like infections of the bone that require amputation.

74. The Defendants caused the constitutional violations suffered by the Mr. Reno and are liable for the damages suffered by Mr. Reno as a result of the policies, practices, and customs that condoned and fostered the unconstitutional conduct of the individual defendants and were a proximate cause of the damages set forth herein.

75. Pursuant to state law, jail administrators, including Warden Billy Massingill, act in their official capacity as the final policy makers of their respective institutions.

76. Warden Massingill is therefore the final policy maker and party responsible for the constitutional healthcare that is owed to Mr. Reno.

77. Defendant Board of County Commissioners for the County of Eddy's policies as written and approved by Warden Massingill therefore became the customs and policies of the Board and of Eddy County.

78. Defendants Board and Bannister practice a custom and policy of providing inadequate medical care to inmates and pretrial detainees at ECDC.

79. The policies, customs, decisions, and practices of Defendants Board and Bannister created a climate within ECDC where staff was unwilling to obtain medical care for inmates or pretrial detainees, even in the face of a clear medical emergency.

80. Defendants Board and Bannister operate ECDC under policies and practice of providing unconstitutional care of inmates and pretrial detainees, especially related to the provision of medical care.

81. Defendants Board and Bannister created an environment where pretrial detainees like Mr. Reno, who had obvious need for orthotic or prosthetic devices and/or the use of shoes and socks to support and protect his feet, were refused medical intervention or prosthetic devices that would reduce his pain and suffering and prevent his serious medical condition from worsening.

82. Defendants Board and Bannister's policies and practices created an environment where the ECDC staff were indifferent to inmates' and pretrial detainees' pain and medical conditions.

83. This includes, without limitation, Warden Massingill's refusal to approve orthotic devices for Mr. Reno based solely on the costs of the orthotics and the costs of Mr. Reno's surgery.

84. There is a causal connection between Defendants Board and Bannister's policies and the violation of Mr. Reno's constitutional rights, which amounts to deliberate indifference.

85. As a proximate and foreseeable result of Defendants' deliberate indifference to Mr. Reno's serious, obvious medical condition, Plaintiff suffered injuries including physical injuries, pain and suffering, emotional distress, exacerbation of his medical condition.

### COUNT III: NEGLIGENT PROVISION OF MEDICAL CARE
### (All Defendants)

86. Pursuant to the New Mexico Tort Claims Act, the sovereign immunity of Defendants does not apply with regard to the incidents described herein because Plaintiff's bodily injury caused by the negligence of Defendants, which negligence occurred while Defendants were acting within the scope of their duties in the operation and the maintenance of a jail, which is a public building, and also in the provision of medical care in the operation of a medical facility such as the jail. Moreover, notice was provided to the Board pursuant to the New Mexico Tort claims act within the prescribed period of time set forth in the act.

87. Defendant ECDC has a non-delegable duty arising from state statute and the United States Constitution to ensure Mr. Reno received constitutionally adequate care while housed at ECDC.

88. Defendant Bannister was at all relevant times a private, independent contractor, contracted with Eddy County to provide medical care for detainees at ECDC.

89. During his incarceration, Mr. Reno exhibited obvious and serious medical symptoms related to his diabetic condition and previous foot amputation.

90. Despite this, ECDC staff and medical staff refused to assess Mr. Reno for orthotics or prosthetics and denied him the use of shoes and socks in order to protect his foot-stump from injury or infection.

91. Consequently, Mr. Reno's right foot began to crack and bleed and became infected – a condition that was exacerbated by Mr. Reno's well-known diagnosis of diabetes.

92. As a result, Mr. Reno's remaining bones in his feet became incredibly painful and infected. He was eventually diagnosed by the medical staff with osteomyelitis, or an infection in his (foot) bone.

93. The standard of care required immediate transport to a hospital once he began exhibiting these symptoms, and a medically appropriate plan to treat his condition—rather than exacerbate it--upon return to the jail.

94. The standard of care also required that Mr. Reno's foot-stump be protected from exposure to unclean and unsanitary concrete floors by: use of orthotics; use of prosthetics; or as Mr. Reno pleaded with the ECDC staff multiple times, simply permitting him to wear shoes and socks.

95. A reasonable healthcare provider would have adhered to the medical standard of care.

96. A reasonable healthcare provider would have assessed Mr. Reno for an orthotic or prosthetic device and, if recommended, ordered one. Alternatively, or in the interim, a reasonable healthcare provider would have ordered that Mr. Reno should be provided and wear shoes and socks to provide support and protection for his foot-stump.

97. A reasonable healthcare provider would have transported Mr. Reno to a hospital the moment he began exhibiting symptoms of pain from his diabetes.

98. A reasonable healthcare provider would have created a medically appropriate plan to treat his condition – rather than exacerbate it – upon return to the jail.

99. Upon information and belief, ECDC has created a policy of refusing transport of pretrial detainees to the hospital, and providing as little medical care as possible, as a cost-saving

strategy. This includes the policy and custom of denying orthotic devices to pretrial detainees like Mr. Reno.

100. Defendants employ medical staff at ECDC, including Defendant Bannister.

101. Defendants are vicariously liable for the acts and omissions of its employees by *respondeat superior*.

102. Defendants had a duty to properly and adequately train its medical staff to respond properly to emergency situations.

103. Defendants breached their duty of care.

104. Defendants' negligence caused Mr. Reno to lose his leg and damages.

105. Defendants' negligence was the proximate cause of this damage.

106. Warden Massingill had a statutory and constitutional duty to provide health care for detainees, including Mr. Reno. Warden Massingill also had a contractual obligation arising from Policy 400.40 that required him to provide orthotic devices for Mr. Reno.

107. Warden Massingill breached his various duties by refusing to provide orthotic devices to Mr. Reno.

108. As a direct and proximate result of Warden Massingill's breaches, Mr. Reno incurred damages.

109. As a proximate and foreseeable result of Defendants' negligence to Mr. Reno's serious, obvious medical condition, Plaintiff suffered injuries including physical injuries, pain and suffering, emotional distress, exacerbation of his medical condition.

WHEREFORE, Plaintiff requests judgment as follows:

A. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

      B.      Punitive damages in an as yet undetermined amount severally against the Defendants.

      C.      Reasonable costs and attorney's fees incurred in bringing this action pursuant to 42 U.S.C. § 1985, et seq., and other authorities.

      D.      Such other and further relief as the Court deems just and proper.

ELIAS LAW P.C.

By:   */s/ Ali M. Morales*
       ALI M. MORLES
       MICHAEL C. ROSS
       DAVID ELIAS IDINOPULOS
111 Isleta SW, Suite A
Albuquerque, NM 87105
(505) 221-6000
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on November 11, 2020, I filed the foregoing electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Ali M. Morales*
ALI M. MORLES