## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

EDWARD RENO,

     Plaintiff,

v.                                                                          Civ. No. 20-918 GJF/KRS

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF EDDY and DARLA
BANNISTER,

     Defendants.

## MEMORANDUM OPINION AND ORDER ON
## THE COUNTY'S THIRD MOTION TO DISMISS

     THIS MATTER is before the Court upon Defendant Board of County Commissioners for the County of Eddy's ("County's") Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Rule 12(b)(6) [ECF 31] ("Motion"). The Motion is fully briefed. *See* ECFs 33 (response), 45 (reply). After thoroughly considering the parties' arguments, and as explained below, the Court will **GRANT IN PART** the County's Motion by **DISMISSING WITH PREJUDICE** Count I of the Second Amended Complaint [ECF 28 at 6-10] with respect to the County. The Court will **DENY** the Motion in all other respects.

## I.   BACKGROUND

     In May 2021, the Court dismissed without prejudice Counts I and II of Plaintiff's First Amended Complaint, which then included three counts. ECF 27. The Court dismissed Count I because it did not state a valid "§ 1983 claim for deliberate indifference under the *Eighth* Amendment," as that Amendment only "protects the rights of *convicted prisoners*"—not the rights of pretrial detainees like Plaintiff. *Id.* at 12-13 (first emphasis added) (quoting *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020)). The Court, however, permitted Plaintiff to amend Count I,

especially as he could bring an essentially identical § 1983 claim for deliberate indifference under the *Fourteenth* Amendment. *Id.* (citing *Strain*, 977 F.3d at 989).

The Court dismissed Count II because it lacked sufficient factual allegations to state a valid § 1983 claim for municipal liability. *Id.* at 13-15 (concluding that the complaint did not "sufficiently allege 'the existence of a municipal policy … [and] a direct causal link between [such a policy] and the injury alleged'" (quoting *Jensen v. West Jordan City*, 968 F.3d 1187, 1204 (10th Cir. 2020))). The Court also permitted Plaintiff an opportunity to amend Count II, particularly as "the Court [was] unaware of, and the County [did] not address, any reason why Plaintiff should not be granted [such] leave." *Id.* at 15.

In June 2021, Plaintiff filed his Second Amended Complaint [ECF 28] ("SAC"). The SAC is essentially identical to its prior iteration, *compare* ECF 12 *with* ECF 28, with two important exceptions. First, Count I (§ 1983 claim for deliberate indifference) is now brought under the *Fourteenth* Amendment. *See* SAC [ECF 28] ¶¶ 40-41 (containing slight modifications to ¶¶ 40 and 41 to reflect this change). Second, what was previously Count II (§ 1983 claim for municipal liability) has now been *entirely omitted* from the SAC. *See id.* at 10-13 (also changing the label on the state law negligence claim, which was previously labeled "Count III," to "Count II").

The SAC alleges the exact same facts as its previous iteration (minus the factual assertions in the 21 paragraphs from the omitted municipal liability claim). *Compare* ECF 12 *with* ECF 28. The SAC still alleges that Plaintiff was a 47-year-old "pretrial detainee in the custody and care of the Eddy County Detention Center [ECDC] from March 22, 2018 to July 5, 2018." SAC ¶¶ 4, 10. It also alleges that, "at the time of his incarceration," Plaintiff suffered from, *inter alia*, "an obvious and previous partial right foot amputation, the result of his diabetes." ¶ 11. ECDC personnel, however, allegedly "withheld [from him] regular [and necessary] changes of socks, and shoes"

and "denied [him] the use of his own orthotic device"—a device that "was to go in his shoe to protect his foot stump."  ¶¶ 11-13, 21.

The SAC further alleges that ECDC personnel were fully aware of Plaintiff's diabetic condition, his exposed foot stump, his *repeated* requests for "regular changes of socks[] and shoes" and an orthotic, and the "cracked and bleeding ulcerations" that gradually developed on his stump.  ¶¶ 10-14, 17, 20, 24, 28-30, 44-53, 68, 73.  Furthermore—despite such knowledge—ECDC personnel allegedly "refused to assess [Plaintiff] for an orthotic or prosthetic device as required by ECDC Policy and Procedure 400.40" and refused to allow him to "wear socks and shoes … to prevent the foot-stub from cracking, bleeding, and becoming infected."  ¶¶ 18, 22, 57, 85.

Consequently, Plaintiff was "required to walk with his bare feet on the bare floor of his cell, on his partially amputated stump."  ¶¶ 14, 29.  Furthermore, such "walk[ing] as a diabetic on his bare feet" caused his feet to "crack and ulcerate."  ¶ 16.  And because "the floor of [his] cell … was not cleaned or disinfected," his stump "soon bec[a]me infected"—ultimately resulting in "a below the knee amputation of [his] right foot and leg."  ¶¶ 15-16, 34.

**A.  Count I (§ 1983 Claim for Deliberate Indifference)**

Brought pursuant to 42 U.S.C. § 1983, Count I alleges that Defendant Darla Bannister was "an independent contractor employed by [the County] as a health care provider" who "violated the *Fourteenth* Amendment … [by] being deliberately indifferent to the serious medical needs of [Plaintiff]."  ¶¶ 8, 41 (emphasis added).  For instance, Plaintiff asserts that Defendant Bannister "failed to appropriately triage [him]," "actively ignored [his] symptoms and complaints," "failed to obtain for him timely medical care by a specialist," "refused to assess [him] for an orthotic or prosthetic device as required by ECDC Policy and Procedure 400.40," "depriv[ed] him of a referral to an orthotic doctor," and refused to provide him "clean socks and shoes."  ¶¶ 22, 49, 57.

A singular paragraph in Count I alleges that ECDC Warden Billy Massingill—who is not named as a defendant but who was allegedly "responsible for the written and unwritten policies and procedures at ECDC," ¶ 7—was himself "deliberately indifferent to [Plaintiff's] constitutional rights … [by] refus[ing] to permit [a *post-amputation* orthotic device] to be ordered due to costs." ¶ 62.  The Court, however, previously concluded that Count I did not state a claim against the County—but rather "only [against] Defendant Bannister."  ECF 27 at 13 n. 6 (citing ECF 12 at ¶¶ 40-62).  In reaching this conclusion, the Court found that Count I "[did] not sufficiently allege that [Warden Massingill's denial of a particular post-amputation orthotic] amount[ed] to 'the existence of a municipal policy … [and] a direct causal link between [such a policy] and the injury alleged.'" *Id.* (quoting *Jensen*, 968 F.3d at 1204); *see also id.* at 14 (finding, *inter alia*, that "no factual allegations suggest[ed] that Warden Massingill made this denial 'pursuant to a policy [he had] adopted'—or did anything more than use his 'discretion in the exercise of [a] particular function'" (quoting *Pembaur v. Cincinnati*, 475 U. S. 469, 482-83 (1986))).

## B.  Count II (NMTCA Claim for Negligence)

Brought under the New Mexico Tort Claims Act (NMTCA), Count II generally alleges that both Defendants had a duty to exercise reasonable care in addressing Plaintiff's special medical needs (e.g., by providing socks, shoes, orthotics, prosthetics, "a medical appropriate plan," and/or "immediate transport to a hospital"), SAC ¶¶ 13, 66, 72-77, 81, 85; that they breached that duty, ¶¶ 68-69, 82, 86; and that such breaches caused physical and economic harm to Plaintiff, ¶¶ 70-71, 83-84, 87-88.  In relevant part, Count II alleges that the County did not exercise reasonable care because it, *inter alia*, failed to follow "the clear language of ECDC Policy and Procedure 400.40 … [to] order a consult for orthotic or prosthetic devices."  ¶¶ 18, 22, 57, 65, 72, 85-86.

### C.  The County's Motion

In June 2021, the County filed the instant Motion, which requests that the Court dismiss with prejudice both of the SAC's claims against the County because the SAC (1) "lack(s) plausible fact allegations sufficient to establish a [§ 1983 claim for deliberate indifference] against the [County]" and (2) "does not [allege] the [negligent] operation of a building" under the NMTCA. Mot. 8.

## II.  ISSUES

The Motion raises the primary issue of whether the SAC contains enough factual allegations to plausibly suggest that:

> (1) a County policy or custom directly caused Defendant Bannister or Warden Massingill to be deliberately indifferent to Plaintiff's serious medical needs, Mot. 2, 5-6 (addressing § 1983 deliberate indifference claim); or

> (2) Plaintiff was injured because County employees failed to exercise reasonable care in discovering and preventing a dangerous condition that threatened a particular class of inmates, Mot. 2-3, 7-9 (addressing NMTCA negligence claim).

### A.  County's Primary Arguments

#### 1.  County's Arguments on Count I (§ 1983 Deliberate Indifference Claim)

The County contends that "there can be no claim against the [County]" without "a claim of an *official policy* causing a constitutional deprivation"—as "§ 1983 liability is not available under the doctrine of respondeat superior."  Reply 1-2 (emphasis added) (quoting *West v. Atkins*, 487 U.S. 42, 54 n.12 (1988)) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).   In light of this principle, the County argues that "Plaintiff has not added any allegations explaining

how the [County] (or any policymaker) had an official policy constituting [the constitutional violation of] deliberate indifference to detainee medical care." Mot. 2.

Indeed, the County asserts that Count I (§ 1983 claim for deliberate indifference) (1) "focuses almost entirely on *[D]efendant Bannister's individual conduct*," *id.* at 5 (emphasis added); (2) contains "no factual allegations suggest[ing] that Warden Massingill [acted] pursuant to a policy he had created or that he was doing anything other than exercising his discretion," *id.* at 6 (citing ECF 27 at 14-15); (3) suggests instead that "[Plaintiff's] treatment [actually] *deviated* from official policy," Reply 3 (emphasis in original); and (4) contains only "[a] few conclusory statements about Warden Massingill," along with "limited allegations mentioning policy [that] are all formulaic recitations or conclusory statements," all of which "fail[] to raise [Plaintiff's] policy claim above the plausibility threshold," Mot. 6; Reply at 5.

Consequently—because "Plaintiff has failed to plead facts setting forth an unconstitutional official policy or custom," *id.* at 5—the County contends that, "to the extent it is still asserted at all, Count I should be dismissed against the [County]," Mot. 6.

### 2. County's Argument on Count II (NMTCA Negligence Claim)

The County argues that Count II (state negligence claim) should be dismissed because the NMTCA does not waive immunity for Plaintiff's allegations. Mot. 7-8. Specifically, the County asserts that "Plaintiff has not plead[ed] facts illustrating [the required] risk to the general public or *a class of users of the building*," Reply 5 (emphasis added). Mot. 7-8 (citing *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259 (N.M. 2006)). In other words, the County contends that, despite Plaintiff's "conclusory" assertion about sanitation, "Plaintiff has plead[ed] facts indicating a condition only risky to him," Reply 6. Mot. 7-8.[1]

---

[1] The County also argues that Plaintiff's suggestion in his SAC that the County was not just negligent in the operation of a "building" under N.M. Stat. Ann. § 41-4-6—but also "in the operation of a medical facility" under § 41-4-9, SAC

6

**B. Plaintiff's Responses**

1. Count I: Deliberate Indifference Claim

Plaintiff's Response makes no reference to the *Monell* standard for municipal liability. *See* Resp. 1-10; *see also infra* Section III(B) (discussing the *Monell* standard, which requires (1) "a municipal policy or custom" and (2) "a direct causal link between the policy or custom" and "the deprivation of federal rights" (quotations omitted)).

Instead, Plaintiff simply asserts that "[t]he County is liable for the acts of Defendant Bannister (a contractor) as well as the decisions and actions of [Warden] Massingill." Resp. 4 (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *West*, 487 U.S. 42, 56; *Nieto v. Kapoor*, 268 F.3d 1208, 1216 (10th Cir. 2001)); *but cf.* Reply 1-2 (asserting that no authority cited by Plaintiff "contradicts the holding from *Monell*"). Plaintiff then concludes that, in "*draw[ing] all reasonable inferences in Plaintiff's favor*" regarding Warden Massingill, the Court should not dismiss Count I with respect to the County. Resp. 5-7 (emphasis in original).

2. Count II: State Negligence Claim

Plaintiff contends that he has "stated a claim sufficient to waive immunity against [the County] under Section 41-4-6" because Plaintiff has "allege[d] a dangerous condition that 'threatens the general public or a class of users of the building.'" Resp. 7-9 (quoting *Castillo v.*

---

¶ 65—still does not waive immunity because "a detention center is not a medical facility for purposes of evaluating a *contractor's* alleged medical negligence." Mot. 8 (emphasis added) (citing *Lessen v. City of Albuquerque*, 187 P.3d 179, 185 (N.M. Ct. App. 2008)). Because Plaintiff has never expressly argued in his Response that he has stated a claim for relief under § 41-4-9's waiver of immunity, *see* SAC; Resp., the Court concludes that § 41-4-9 is no longer a viable theory of relief. *See also May v. Bd. of Cty. Comm'rs*, No. CIV 18-0126 JB/LF, 426 F. Supp. 3d 1013, 1020-21 (D.N.M. Sept. 27, 2019) (observing that "New Mexico courts have generally denied the application of § 41-4-9 and found immunity for the state government entity and employees when medical contractors operate the medical unit in question" (citing cases)). Nevertheless, Plaintiff may still pursue Count II with respect to the County (albeit under a different theory of relief), as the Court concludes that the SAC states a claim for relief under § 41-4-6's waiver of immunity. *See infra* Section IV(B) (concluding that the SAC's factual allegations plausibly suggest that the County was negligent in the operation of a building—i.e., that County employees failed to exercise reasonable care in discovering and preventing a dangerous condition that threatened a particular class of inmates and thereby injured Plaintiff).

*Cnty. of Santa Fe*, 755 P.2d 48, 51 (N.M. 1988)) (citing *Callaway v. New Mexico Dept. of Corrections*, 875 P.2d 393, 395, 398 (N.M. Ct. App. 1994)).

Specifically, Plaintiff argues that the County failed to follow proper sanitation procedures—namely by "forcing [a diabetic amputee inmate with a foot stump] to walk barefoot on a bare, un-sanitized, cold concrete floor," SAC ¶ 49—because the County denied his repeated requests for "orthotics, prosthetics, or [even] the use of shoes and socks."  Resp. 7-8 (citing SAC ¶¶ 69, 71, 73); *see also* SAC ¶¶ 17-18 (alleging that a written policy "require[d] ECDC staff and medical staff to identify detainees that require an orthotic or prosthetic device at the time of the detainee's intake at the jail and to order one for a detainee if they arrive to ECDC without an orthotic device").  Plaintiff further asserts that this failure created a dangerous condition that threatened not just him—but rather a similarly situated class of diabetic amputee inmates: those who "reli[ed] on orthotics (or shoes and socks) to remain safe and sanitary."  *Id.* at 8-9.

Plaintiff concludes that "the County is liable for [such] conditions in the jail" because it could have reasonably foreseen and prevented them.  *Id.*

## III. APPLICABLE LAW

### A.  General Pleading Standard

"A pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Otherwise, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss such a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

"To survive a Rule 12(b)(6) motion," *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020), a claim for relief must "contain enough allegations of *fact*, taken as true, to state a claim to relief that is plausible on its face."  *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187,

1195 (10th Cir. 2018) (emphasis added) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012)).  Consequently, when the Court "evaluat[es] the sufficiency of a complaint," it must "disregard conclusory statements and look only to whether the remaining, *factual* allegations plausibly suggest the defendant is liable." *Id.* (emphasis added) (quoting *Khalik*, 671 F.3d at 1191).  In other words, "'legal conclusions' as well as '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,'" are not "entitled to the assumption of truth." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)).  Instead, the court is to only "'assume the veracity' of the well-pleaded factual allegations 'and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679); *see also Iqbal*, 556 U.S. at 678 (explaining that such well-pled "factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

### B.  Municipal Liability under 42 U.S.C. § 1983

Under 42 U.S.C. § 1983, any "person" acting under color of state law who "subjects … [another] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  In addition, "municipalities and other local government units [are] included among those persons to whom § 1983 applies." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Nevertheless, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1952 (2018) (quoting *Monell*, 436 U.S. at 691).  In other words, "a municipality cannot be held liable … solely because it employs a tortfeasor." *L.A. County v. Humphries*, 562 U.S. 29, 36 (2010) (quoting *Monell*, 436 U.S. at 691).  "Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct

causal link between the policy or custom and the injury alleged." *Jensen v. West Jordan City*, 968 F.3d 1187, 1204 (10th Cir. 2020) (quoting *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)); *see also Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (noting that "a municipality may not be held liable where there was no underlying constitutional violation by any of its officers").

"Thus, to establish municipal liability, a plaintiff must first demonstrate a 'municipal policy or custom,' which may take one of the following forms:"

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority;[2] (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)); *see also Abila v. Funk*, No. 14-1002 JB/SMV, 2016 U.S. Dist. LEXIS 172737, at *45-53 (D.N.M. Dec. 14, 2016) (reviewing numerous municipal liability cases and concluding that "[they] all stand for the same thing: at the pleading stage, the existence of a *Monell* policy is a 'conclusion' to be built up to, rather than a 'fact' to be baldly asserted").

---

2 "[W]hether a particular official has '*final* policymaking authority' is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis added); *see also Pembaur v. Cincinnati*, 475 U. S. 469, 483 (1986) (observing that "[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority"). Furthermore, "the challenged action must have been taken *pursuant to a policy adopted by the official* … responsible under state law for making policy in that area of the city's business." *Id.* (emphasis added). In other words, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U. S. at 482. Thus, "the fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.*

Second, a plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).  In other words, a plaintiff must "show[] that 'the municipality was the "moving force" behind the injury alleged'"—particularly since "municipal liability in a § 1983 case cannot be established on a theory of vicarious liability."  *Id.* (quoting *Brown*, 520 U.S. at 404); *see also Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010) (observing that a municipality "will only be held liable for its own acts—acts it has officially sanctioned or ordered" (quotation omitted)).  Consequently, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  *Waller*, 932 F.3d at 1284 (quoting *Brown*, 520 U.S. at 405).[3]

## C.  New Mexico Tort Claims Act, Section 41-4-6

The NMTCA, N.M. Stat. Ann. §§ 41-4-1 to 41-4-30 (1976, as amended through 2020), provides that—"except as waived by" specific statutory provisions—"[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort."  § 41-4-4.  Section 41-4-6 of the NMTCA provides the following waiver of immunity:

> [Such] immunity [from tort liability] does not apply to liability for damages resulting from bodily injury … caused by the negligence of public employees[4] while acting within the scope of their duties in the *operation or maintenance of any building*, public park, machinery, equipment or furnishings.

---

[3] *See, e.g., id.* (observing that "at least for claims of inadequate hiring, training, or other supervisory practices, a plaintiff must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences"—particularly as "[a] less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities" (quotations omitted)).

[4] The term "public employee" includes "licensed medical … practitioners providing services to the corrections department pursuant to contract." § 41-4-3(F).

§ 41-4-6(A) (emphasis added).

The Supreme Court of New Mexico has observed that liability under the NMTCA is "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." *Encinias v. Whitener Law Firm, P.A.*, 310 P.3d 611, 616 (N.M. 2013) (quoting § 41-4-2(B)).[5]   Consequently, "the waiver of liability in Section 41-4-6(A) incorporates the concepts of premises liability found in [New Mexico] case law." *Id.*  "Like common-law premises liability, the waiver in Section 41-4-6(A) is not limited to injuries occurring on the defendant's property" or to "injuries resulting from a physical defect on the premises."  *Id.* "Instead, [the Supreme Court of New Mexico] interpret[s] Section 41-4-6(A) *broadly* to waive immunity 'where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective *condition* on property owned and operated by the government.'" *Id.* at 616-17 (emphasis added) (quoting *Castillo v. Cnty. of Santa Fe*, 755 P.2d 48, 49 (N.M. 1988)).

"Such a [dangerous] condition could take many forms."  *Id.* at 617.  For example, a dangerous condition may exist not only in "the operation or maintenance of the physical aspects of the building"—but also in the "safety policies necessary to protect the people who use the building." *Id.* (quoting *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1261 (N.M. 2006)).

---

[5] In exercising is supplemental jurisdiction under 28 U.S.C. § 1367, the Court "appl[ies] the substantive laws of the forum state," *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996), particularly by "follow[ing] the most recent decisions of the state's highest court."  *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665-66 (10th Cir. 2007) (citing *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)).  And "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.* at 666 (quoting *Wankier*, 353 F.3d at 866).  In making such a prediction, the federal court may "seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law."  *Id.* (internal quotation marks and citations omitted).  But the federal court "must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently."  *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940).  In addition, if the Tenth Circuit has "rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit … unless an intervening decision of the state's highest court has resolved the issue."  *Wankier*, 353 F.3d at 866 (citations omitted).

Although it may take many forms, the dangerous condition must nevertheless "threaten[] the general public or *a class of users of the building*." *Upton*, 141 P.3d at 1261 (emphasis added).[6]

The New Mexico Supreme Court in *Upton* held that a public school's failure "to follow appropriate safety procedures"—i.e., "its safety policies for students with special needs and students in acute medical distress"—fell "comfortably within the Section 41-4-6 waiver for 'operation or maintenance' of a public building." *Upton*, 141 P.3d at 1262-63. In reaching this holding, the court reasoned that such a failure "towards [*one* asthmatic student's] special medical needs [made] it more likely that *all* similarly situated students were at risk as well." *Id.* at 1264-65 (emphasis added). Consequently, the court found that the complaint alleged a "dangerous condition for all special-needs children"—and not just an "action uniquely affecting only one student." *Id.* at 1265.[7] The holding in *Upton* has been applied by other courts in this District to

---

[6] Some examples of dangerous conditions that threaten a class of building users (or the general public) include (1) "wild dogs roaming the grounds of a [public] housing project," *Encinias*, 310 P.3d at 617 (citing *Castillo*, 755 P.2d at 49, 51); (2) "a high volume of cars exiting a parking lot after a concert," *id.* (citing *Bober v. N.M. State Fair*, 808 P.2d 614, 616 (N.M. 1991)); (3) "a municipal swimming pool with an inadequate number of lifeguards;" *id.* (citing *Leithead v. City of Santa Fe*, 940 P.2d 459, 463 (N.M. Ct. App. 1997)); (4) "allowing known gang members [in a prison] to congregate in a recreation room that is shielded from observation by guards," *id.* (citing *Callaway*, 875 P.2d 393, 395, 399 (N.M. Ct. App. 1994)); and (5) "a school's failure to address a pattern of student violence in a particular area," *id.* at 618.

In contrast, examples of conditions that are either non-dangerous or non-threatening to a class of property users include (1) "a playground [that] was generally 'a safe area for children,'" *id.* (quoting *Espinoza v. Town of Taos*, 905 P.2d 718, (N.M. 1995)); (2) "a single act of student-on-student violence" with no "facts to suggest that the school, in the exercise of ordinary care, could have [a] discovered that the violence was about to occur and … [b] protected the student from injury," *id.* (citing *Pemberton v. Cordova*, 734 P.2d 254, 255 (N.M. Ct. App. 1987)); and (3) "a single, discrete administrative decision affecting only a single person," *Upton*, 141 P.3d at 1261-63 (citing *Archibeque v. Moya*, 866 P.2d 344, 347 (N.M. 1993)). *See also Archibeque*, 866 P.2d at 345-48 (holding that a prison intake officer's negligence in "performing an administrative function" "create[d] a risk of harm for [only] a single [prisoner]" and "did not create an unsafe condition on the prison premises"—particularly when that officer's administrative negligence occurred when, in a meeting with the prisoner to "discuss whether [he] had any known enemies" before "releas[ing] [him] into the general prison population," the officer wrongly concluded ("without checking an available printout of current inmates") that the prisoner's expressly identified enemy was "no longer imprisoned at the penitentiary").

[7] *See also Encinias*, 310 P.3d at 617 (recounting *Upton's* holding that "a public school creates an unsafe condition for its students when it actively violates the students' individualized education programs and then fails to follow proper emergency procedures" (citing *Upton*, 141 P.3d at 1263-64)); *Tafoya v. New Mexico*, No. CIV 19-0675 JB/SCY, 517 F. Supp. 3d 1250, 1286 (D.N.M. Feb. 4, 2021) (observing that the dangerous condition in *Upton* threatened a class of building users because "(i) the school ignored information that the [student's parents] provided them; (ii) the school

conclude that when detention centers fail to properly address an inmate's special medical needs, particularly by not following their own policies, these facilities create a dangerous condition that threatens "a class of building users—incarcerated inmates with medical issues." *Rave v. Bd. of Comm'rs for Cty. of Bernalillo*, No. CIV 17-0636 RB/LF, 2017 U.S. Dist. LEXIS 132382, 2017 WL 3600452, at *10 (D.N.M. Aug. 18, 2017).[8]

"Just as businesses must exercise reasonable care to discover and prevent dangerous conditions caused by people on their premises, so must the government." *Encinias*, 310 P.3d at 618-19 (citing *Coca v. Arceo*, 376 P.2d 970, 973 (N.M. 1962)).  Consequently, the government "can [even be liable for the [tortious] acts of a third party if the government reasonably should have discovered and could have prevented the incident."  *Id.* at 619; *see also id.* at 618-19 (observing that, although prisons need not "do everything that might be done," they cannot "turn a blind eye to threats to their inmates' safety" (quotation omitted)).

---

failed to warn the substitute teacher about the student's [asthmatic] condition; and (iii) the school failed to follow through with the proper emergency procedures" (quotation omitted) (citing *Upton*, 141 P.3d at 1260)).

[8] *See id.* at *1-4, 10 (applying *Upton* in concluding that a complaint plausibly suggested that a "dangerous condition" affected "a class of building users—incarcerated inmates with medical issues"—because the complaint alleged that "the [c]ounty [detention center]'s employees [1] ignored information [a plaintiff] gave them about his medical condition [i.e., 'chronic kidney disease [that required] dialysis three times a week'], [2] failed to staff the facility or manage or train its employees to render aid to inmates with medical conditions, and [3] failed to follow through with and/or enforce its policies related to inmates with medical issues" (citing *Upton*, 141 P.3d at 1264)); *Armijo v. Bd. of Cty. Comm'rs of Socorro*, Civ. No. 20-355 GBW/SMV, 2021 U.S. Dist. LEXIS 58705, 2021 WL 1176317, at *9-11 (D.N.M. Mar. 28, 2021) (applying *Upton* in concluding that a complaint "sufficiently establish[ed] a dangerous condition" because the complaint alleged that "[1] [a suicidal prisoner] had special medical needs; [2] [the detention center] was advised of those needs and had policies designed to address those needs; and [3] on several occasions [detention center] employees failed to follow those policies, resulting in harm"—and further observing that the detention center's failure to "follow appropriate safety policies as to [that suicidal prisoner] put all suicidal prisoners at risk" (citing *Upton*, 141 P.3d at 1263-65)).

## IV. ANALYSIS

For the following reasons, the Court holds that (1) Count I does not state a valid municipal liability claim under § 1983 and (2) Count II states a valid claim against the County under the NMTCA.

### A.  Count I Does Not State a Valid Municipal Liability Claim under 42 U.S.C. § 1983

The Court begins by observing that it has already addressed Plaintiff's assertions of § 1983 municipal liability.  *See* ECF 27 at 13-15.  In doing so, the Court concluded that Plaintiff's § 1983 municipal liability claim (then Count II) did not "state a claim upon which relief can be granted." *Id.* at 13 (quoting Fed. R. Civ. P. 12(b)(6)).  In other words, "the Court [found] that there [were] insufficient 'allegations of *fact*, taken as true,' to '*show* [or plausibly suggest] the existence of a municipal policy or custom,' that caused a 'constitutional violation by any of [the municipality's] officers.'"  *Id.* at 13 (emphasis in original) (quoting *Alpenglow*, 894 F.3d at 1195; *Jensen*, 968 F.3d at 1204; *Graves*, 450 F.3d 1215).

> Indeed, [then] Count II [did] little more than recount Plaintiff's specific allegations of inadequate medical care (e.g., a denial of socks, shoes, orthotics, prosthetics, a clean cell floor, and appropriate management of diabetic complication), *see* [ECF 12 at] ¶¶ 72-73, 79, 81-83—and then baldly asserts that this inadequate care was the result of "[a] *policy* of providing inadequate medical care," *see* [ECF 12 at] ¶¶ 66, 69, 70-71, 74, 78, 80 (emphasis added).  But Plaintiff's "conclusory statements" that such a policy existed—i.e., his "[t]hreadbare recitals of [an] element[] of a [municipal liability] cause of action"—[were] not "entitled to the assumption of truth."  *Alpenglow*, 894 F.3d at 1195; *see also Abila*, No. 14-1002 JB/SMV, 2016 U.S. Dist. LEXIS 172737, at *45-53 (reviewing numerous municipal liability cases and concluding that "[they] all stand for the same thing: at the pleading stage, the existence of a *Monell* policy is a 'conclusion' to be built up to, rather than a 'fact' to be baldly asserted").

ECF 27 at 13-14.

The Court further observes that Plaintiff has entirely omitted this § 1983 municipal liability claim from the SAC.  And to the extent that Count I (§ 1983 deliberate indifference claim) was

somehow intended to also assert (in essentially one paragraph) municipal liability against the
County due to the Warden's actions, the Court has already addressed such an eventuality:

> The Court notes that Count I applies only to Defendant Bannister. … [Paragraph
> 62] does not sufficiently allege that [Warden Massingill's denial of a particular
> post-amputation orthotic] amounts to "the existence of a municipal policy … [and]
> a direct causal link between [such a policy] and the injury alleged." *Jensen*, 968
> F.3d at 1204.
> …
> [N]o factual allegations suggest that Warden Massingill made this denial "pursuant
> to a policy [he had] adopted"—or did anything more than use his "discretion in the
> exercise of [a] particular function." *Pembaur*, 475 U. S. at 482-83.

ECF 27 at 13-14 & n.6.

Furthermore, the Court renews its holding that the SAC—and particularly Count I—does
not plausibly suggest "the existence of a municipal *policy or custom*," *Jensen*, 968 F.3d at 1204
(emphasis added), that directly caused Defendant Bannister or Warden Massingill (or anyone else)
to "depriv[e] [Plaintiff] of [his] federal [Fourteenth Amendment] rights," *Schneider*, 717 F.3d at
770, through deliberate indifference to his serious medical needs. *See also* SAC ¶¶ 1-64.  In other
words, the Court holds that Count I does not state a valid municipal liability claim under § 1983.

Consistent with this holding, the Court agrees with the County that "municipal liability in
a § 1983 case cannot be established on a theory of vicarious liability," *Schneider*, 717 F.3d at
770—but rather requires "a claim of an *official policy* causing a constitutional deprivation," Reply
1-2 (emphasis added) (citing *Monell*, 436 U.S. at 658)—and that Plaintiff's suggestion otherwise
is incorrect. *See* Reply 1-2.[9]

---

[9] Indeed, the three cases cited by Plaintiff, *see* Resp. 4 (citing *Estelle v. Gamble,* 429 U.S. 97, 103 (1976); *West v. Atkins*, 487 U.S. 42, 56 (1988); *Nieto v. Kapoor*, 268 F.3d 1208, 1216 (10th Cir. 2001)), in support of this suggestion simply stand for the proposition that—in determining whether an *individual* "acted under color of state law for purposes of § 1983," *West*, 487 U.S. at 56 (citing *Estelle*, 429 U.S. at 103-05)—there is no "dispositive distinction between actors employed directly by the state and those affiliated with the state under a contractual arrangement," *Kapoor*, 268 F.3d at 1216 (citing *West*, 487 U.S. at 55-56).  These cases do not contradict the "well established" principle that "in a § 1983 case a city or other local *governmental entity* cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'"  *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1952 (2018) (emphasis added) (quoting *Monell*, 436 U.S. at 691).

Even taken as true, the facts alleged against Warden Massingill in ¶¶ 37 and 62 do not plausibly suggest that his actions or decision caused Plaintiff any harm at all. The SAC alleges that Plaintiff underwent the partial amputation on June 8, 2018, ¶ 34, and was released from ECDC less than four weeks later, ¶ 4 (citing July 5, 2018, as the end date of custody). The SAC alleges that the warden's conversation with Plaintiff occurred sometime *after* the operation, which would place it in the short interim before Plaintiff's release. The SAC is altogether silent on any additional increment of harm to Plaintiff occasioned by the warden's decision not to have ECDC arrange for an orthotic device. The legal conclusions in ¶ 64 are not the kind of *factual* assertions that the Tenth Circuit has made clear are required to state a plausible claim. *See Alpenglow*, 894 F.3d at 1195 (instructing the courts to "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable"); *see also* ECF 27 at 14 (the Court previously observing that "no factual allegations provide[d] 'a direct causal link' between [the Warden's alleged] denial [of a post-amputation orthotic] and [an] injury" (quoting *Graves*, 450 F.3d at 1218)).[10]

Finally, the Court notes that Plaintiff has not expressly "request[ed] … leave to [further] amend the complaint," *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020). *See* Resp.; *cf.* ECF 14 at 10 (Plaintiff previously requesting "leave to amend [the prior iteration of Count I]" so that it would state a "Fourteenth Amendment claim[]"). In light of such

---

[10] In addition, the Court disagrees with Plaintiff assertion that paragraph 7 of his SAC permits the reasonable inference that Warden Massingill "knew about [Plaintiff's] medical conditions because Massingill, in his official capacity, is responsible [for] ensuring adequate medical care for detainees at ECDC, even if the ECDC hires contract medical providers." Resp. at 5-6 (citing SAC ¶ 7). Such an inference is not reasonable because the SAC alleges only that "Warden Massingill was also responsible for ensuring that detainees at ECDC received medical care that complied with the New Mexico and United States Constitution." ¶ 7. The Court reads that allegation as nothing more than the commonsense expression of ultimate legal responsibility for inmate medical care. The Court does not infer from paragraph 7 that the senior-ranking official at a detention center would or should be actually aware of the medical conditions of each of the inmates in his or her custody. Consequently, the Court construes the SAC to allege that Warden Massingill's knowledge of Plaintiff's medical condition extended only to the amputation surgery and the need for a new and re-sized orthotic device.

circumstances—and given the Court's "determination that [further] amendment [to Count I] would be futile" in terms of stating a valid municipal liability claim, *Quintana*, 973 F.3d at 1033 (quotation omitted)—the Court will dismiss Count I with prejudice with respect to the County.

### B.  Count II States Valid Claim Against County under NMTCA, Section 41-4-6

The Court holds that the SAC states a claim for relief under the NMTCA because it "plausibly suggest[s]," *Alpenglow*, 894 F.3d at 1195, that County employees were "negligen[t] … in the operation or maintenance of [the ECDC]."  N.M. Stat. Ann. § 41-4-6(A).  .

Although the County argues that "Plaintiff has not plead[ed] facts illustrating [the required] risk to … a class of [inmates]," Reply 5, the Court concludes otherwise.  As mentioned, the SAC alleges that ECDC personnel were aware of Plaintiff's diabetic condition, his exposed foot stump, his repeated requests for "regular changes of socks[] and shoes" and an orthotic, and even the "cracked and bleeding ulcerations" that gradually developed on his stump.  SAC ¶¶ 10-14, 17, 20, 24, 28-30, 44-53, 68, 73.  And despite such awareness, ECDC personnel allegedly "refused to assess [Plaintiff] for an orthotic or prosthetic device *as required by ECDC Policy and Procedure* 400.40" and refused to allow him to "wear socks and shoes … to prevent the foot-stub from cracking, bleeding, and becoming infected."  ¶¶ 18, 22, 57, 85 (emphasis added).  The SAC thus puts forth factual allegations that plausibly suggest that County employees (1) "ignored information [Plaintiff] gave them about his medical condition," *Rave*, No. CIV 17-0636 RB/LF, 2017 WL 3600452, at *10; (2) were "indifferen[t] towards" or failed to address such "special medical needs," *Upton*, 141 P.3d at 1262, 1265; and (3) failed "to follow appropriate safety procedures," *id.* at 1262-63.

Such allegations take this case beyond "a single, discrete administrative decision affecting only a single [inmate]," *Upton*, 141 P.3d at 1261-63 (citing *Archibeque*, 866 P.2d at 347).  Indeed,

these allegations—especially the allegation that County employees failed to follow established policy regarding inmates' special medical needs—"make[] it more likely that all similarly situated [inmates] were at risk as well." *Id.* at 1265. And such a failure amounts to dangerous condition that threatens "a class of building users—incarcerated inmates with medical issues." *Rave*, No. CIV 17-0636 RB/LF, 2017 WL 3600452, at *10; *Armijo*, Civ. No. 20-355 GBW/SMV, 2021 WL 1176317, at *9-11; *Upton*, 141 P.3d at 1262-65. At the pleading stage, taking all factual allegations as true and indulging all reasonable inferences in Plaintiff's favor, the Court concludes that the factual allegations in the SAC place Plaintiff in a class of building users (ECDC inmates) with a widespread disease (diabetes) that often features obvious physical manifestations and symptoms that range from mild to serious to potentially lethal (requiring amputation to stem infections).

In sum, the Court holds that the SAC's factual allegations plausibly suggest that County employees failed to "exercise reasonable care to discover and prevent [a] dangerous condition[]," *Encinias*, 310 P.3d at 618, that "threaten[ed] … a class of [inmates]," *Upton*, 141 P.3d at 1261, and thereby injured Plaintiff. The SAC thus states a claim for relief under the NMTCA, and the Court will permit Plaintiff to maintain Count II with respect to the County.

## V. CONCLUSION

Because Count I fails to state a valid municipal liability claim under § 1983, **IT IS ORDERED THAT** the Motion is **GRANTED IN PART** and Count I of the SAC [ECF 28 at 6-10] is **DISMISSED WITH PREJUDICE** as to the County.[11]

Because Count II states a valid claim against the County under the NMTCA, however, **IT IS FURTHER ORDERED** that the Motion is otherwise **DENIED**.

---

[11] Count I still remains pending—but only with respect to Defendant Bannister.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*